UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

TONY MILLEDGE,
    *Plaintiff*,

v.

CITY OF HARTFORD,
    *Defendant*.

No. 3:19-cv-1104 (JAM)

### ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Tony Milledge claims that various supervisors and coworkers at the Hartford Fire Department subjected him to discrimination on the basis of his race and age. After filing a charge with the Connecticut Commission on Human Rights and Opportunities (CHRO) and the Equal Employment Opportunity Commission (EEOC), Milledge brought this action against the City of Hartford alleging violations of Title VII of the Civil Rights Act (Title VII), 42 U.S.C. §§ 2000e, *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*[1]

I dismissed in part Milledge's initial complaint, and he has since filed an amended complaint.[2] The City now moves for summary judgment in its favor on all claims.[3] For the reasons stated below, I will grant the City's motion for summary judgment.

### BACKGROUND

The facts set forth below are taken from the City's statement of material facts, all of which Milledge has admitted without adding any facts of his own.[4] Any ambiguity is construed

---

[1] Doc. #1 (complaint).
[2] *See Milledge v. City of Hartford*, 2020 WL 3510813 (D. Conn. 2020) (order granting partial motion to dismiss); Doc. #24 (amended complaint).
[3] Doc. #43.
[4] Doc. #43-1 (Hartford's statement of material facts); Doc. #44-1 at 1 ("The plaintiff admits all of the material facts set forth in the defendant's Statement of Material Facts and has no additional material facts to add.").

in the light most favorable to Milledge as the non-moving party.

Milledge is a 56-year-old African American man.[5] He worked for the City of Hartford as a firefighter for 21 years, from 1999 to 2020.[6] He claims that he was denied promotions to which he was entitled in 2006, 2009, and 2014, all in favor of lesser-qualified white firefighters.[7]

When Milledge's mother died in May 2008, the City's Human Resources Director denied Milledge leave under the Family and Medical Leave Act (FMLA).[8] Milledge is not aware of any white firefighter who has been denied leave under such circumstances.[9]

In 2008 or 2009, Milledge received an 89-day suspension after testing positive for drug use.[10] In 2012 or 2013, Milledge was ordered not to leave the fire station to get food even though white firefighters were allowed to do so.[11]

In July 2015, Milledge left the firehouse to go to the store after having been given an order by his direct supervisor not to leave.[12] Chief Scott Brady thereupon instructed Milledge to take a drug test, which he refused to do.[13] As a consequence, Milledge was required to submit to random drug and alcohol testing for the next two years.[14] He does not know what drug testing the City required of other firefighters.[15]

Milledge filed a complaint with the EEOC claiming that Brady had falsely accused him of taking drugs and had interfered with his collection of workers compensation benefits.[16] This

---

[5] Doc. #24 at 1 (¶ 3); Doc. #43-10 at 9 (¶ 7) (CHRO affidavit indicating that Milledge was 52 in August 2018).
[6] Doc. #43-2 at 1 (¶ 1).
[7] *Id*. at 10 (¶ 65).
[8] *Ibid*. (¶ 66).
[9] *Ibid*.
[10] *Id*. at 2 (¶ 7).
[11] *Id*. at 10 (¶ 67).
[12] *Id*. at 1 (¶¶ 2-3).
[13] *Id*. at 1-2 (¶¶ 2, 5).
[14] *Id*. at 2 (¶ 5).
[15] *Ibid*. (¶ 8).
[16] *Id*. at 2, 3 (¶¶ 6, 15); Doc. #43-3 at 18 (Milledge deposition).

was the first time Milledge lodged a complaint about being treated differently than other firemen.[17] Brady was subsequently removed from his position, and the last time Milledge saw him was at a grievance hearing in 2016.[18] Milledge also filed a grievance with the U.S. Department of Labor challenging the drug-testing requirement, and the Department ordered that his drug testing cease in September 2017.[19] He was never again required to undergo drug testing.[20]

In August 2017, Milledge attended training academy after taking a leave of absence from work for longer than 45 days.[21] The City requires firefighters to complete regular training exercises involving ladder work, in keeping with industry standards.[22] During training, Chief Chris Kerr directed white members of a ladder company to assign Milledge the most physically demanding ladder work despite his knowledge that Milledge's previous injuries made such work especially difficult for him.[23] Milledge was subject to the same training that all firefighters are required to complete following a prolonged absence from work.[24]

While Milledge was at the training academy in September 2017, Chief William Kerr reprimanded him for using the handicapped bathroom.[25] Milledge accused Kerr of yelling and screaming at him, but two witnesses reported that Kerr had not raised his voice or threatened Milledge.[26] During a meeting following the incident with Chief Frank Costello and Assistant Chief Darren Hudson, Milledge was texting on his phone.[27] Following the meeting, Milledge

---

[17] Doc. #43-2 at 1 (¶ 4).
[18] *Id*. at 5 (¶ 9).
[19] *Ibid*. (¶ 10).
[20] *Ibid*.
[21] *Id*. at 4 (¶ 25).
[22] Doc. #43-7 at 6-32.
[23] Doc. #43-2 at 4 (¶ 22).
[24] *Id*. at 4-6 (¶¶ 23-43).
[25] *Id*. at 6-7 (¶¶ 44-45).
[26] *Id*. at 7 (¶¶ 46-49).
[27] *Ibid*. (¶ 50).

told Costello and Hudson that he was feeling well enough to finish the day in training but then proceeded to ask a different supervisor for permission to get some aspirin from a nearby drug store and left the training grounds for about 90 minutes.[28] In a separate incident later that week, Milledge was speaking by phone with the president of the local firefighter union when Costello told him he would be fired if he did not hang up the call.[29]

On several occasions in 2017, Captain Lionel Thompson told Milledge that he should retire.[30] Milledge does not claim that Thompson made any reference to his race or age during these conversations. Instead, he says Thompson encouraged him to retire because of his 2015 EEOC complaint about Chief Brady.[31] According to the City, the context of Thompson's comments was that a recent change in city administration caused many firefighters in 2016 and 2017 to openly discuss whether retirement was financially advantageous in light of possible changes to their employment benefits and terms.[32]

In March 2018, Milledge was on a duty call when Chief Ian Tenney began harassing him, yelling, and screaming at him inches from his face.[33] Tenney was verbally abusive and shamed Milledge by calling him names including "a piece of shit" in front of his co-workers.[34] Tenney also called him on the phone two or three times in the morning, cursed at him, and yelled and screamed things like "You got them damn reports ready?" and "Did you get those fucking reports done?"[35] Milledge believed his issues with Tenney were as a result of his 2015 EEOC complaint about Brady.[36]

---

[28] *Id*. at 7-8 (¶ 52); Doc. #43-8 at 2 (Costello report).
[29] Doc. #43-2 at 7 (¶ 51); Doc. #43-3 at 48.
[30] Doc. #43-2 at 8 (¶ 54).
[31] *Ibid*. (¶ 55).
[32] *Id*. at 8-9 (¶¶ 56-60).
[33] *Id*. at 2-3 (¶ 12).
[34] *Id*. at 3 (¶ 13).
[35] *Ibid*. (¶ 15).
[36] *Ibid*. (¶ 16).

In March 2018, Milledge also had an altercation with Chief Jim Errickson in which Errickson pushed him.[37] Errickson explained that he was trying to protect Milledge from broken glass, but Milledge thought this explanation was "nonsense."[38] Milledge generally found Errickson to be a "nice guy" and got along with him until he made the complaint about Brady.[39]

In August 2018, Milledge filed complaints with the CHRO and the EEOC.[40] After receiving a release and notice of right to sue, he brought this action in July 2019, alleging that the City subjected him to race and age discrimination in the form of a hostile work environment in violation of Title VII, the ADEA, and the Connecticut Fair Employment Practices Act (CFEPA).[41]

After the City successfully moved to dismiss the Title VII and CFEPA claims, Milledge filed an amended complaint in July 2020.[42] The amended complaint describes two further instances of adverse conduct. First, in October 2019 someone broke into Milledge's locker at the fire station.[43] Milledge does not know who was responsible for this incident.[44] Second, over the course of his career as a firefighter Milledge received repeated calls on his work phone in which the caller used the n-word.[45] Although Milledge believes that the callers were white firefighters, he cannot identify any of the callers and is unsure whether they were white or firefighters at all.[46]

Although the amended complaint contains a CFEPA claim, Milledge has withdrawn that claim, leaving only his hostile workplace environment claims under Title VII and the ADEA.[47]

---

[37] *Ibid*. (¶ 18).
[38] *Ibid*.
[39] *Id*. at 3-4 (¶ 19).
[40] Doc. #24 at 2 (¶ 5).
[41] Doc. #1.
[42] Doc. #24.
[43] *Id*. at 9 (¶ 61).
[44] *Ibid*.
[45] *Ibid*. (¶ 63); Doc. #43-3 at 36.
[46] Doc. #43-2 at 9 (¶ 63).
[47] Doc. #44 at 1-2.

In January 2022, the City moved for summary judgment.[48] The parties have briefed and argued the motion.[49] This ruling now follows.

## DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close and contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Benzemann v. Houslanger & Assocs., PLLC*, 924 F.3d 73, 78 (2d Cir. 2019).

### *Title VII hostile workplace environment*

To prevail on a hostile-work-environment claim under Title VII, a plaintiff first must show that "the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).[50] The plaintiff must also show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015). "This test sets a high bar as the plaintiff must show not only that he subjectively perceived the environment

---

[48] Doc. #43.
[49] Doc. #44 (opposition); Doc. #46 (reply).
[50] For purposes of readability, my quotations from court decisions in this ruling omit internal citations, quotation marks, and bracketing unless otherwise noted.

6

to be abusive, but also that the environment was objectively hostile and abusive." *Sealy v. State Univ. of New York at Stony Brook*, 834 F. App'x 611, 615 (2d Cir. 2020).

To show that an employer's adverse action was motivated by discriminatory intent, a plaintiff must offer either direct or circumstantial evidence. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). Sometimes a plaintiff may offer specific remarks or statements that reveal racial animus. Other times a plaintiff may show that the employer afforded preferential treatment to one or more other employees who are similarly situated to the plaintiff but who are not the same race as the plaintiff. "Although facially neutral incidents may be included in evaluating the totality of the circumstances, there must be some circumstantial or other basis for inferring that incidents race-neutral on their face were in fact discriminatory." *Berrie v. Bd. of Educ. of Port Chester-Rye Union Free Sch. Dist.*, 750 F. App'x 41, 47 (2d Cir. 2018).

The problem for Milledge is that the only evidence of racial animus he has offered is the string of racist anonymous calls he received. But Milledge has not shown that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 397 (S.D.N.Y. 2019) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)). Because Milledge has not offered any evidence to show that these anonymous calls were made by or at the behest of his fellow firefighters, there is simply "no evidence that [Hartford] had any control over or permitted the anonymous caller[s] to make such calls." *Katzev v. Retail Brand All., Inc.*, 2010 WL 2836159, at *4 (S.D.N.Y. 2010); *see also Tyson v. Dep't of Energy & Env't Prot.*, 2021 WL 4895898, at *1 (D. Conn. 2021) (dismissing hostile work environment claim involving allegations that someone

put a hangman's noose by plaintiff's workspace where there was no allegation that the employer knew or was responsible).

Nor does Milledge claim to have reported other anonymous misconduct such as his 2019 locker break-in to his supervisors or human resources.[51] Consequently, even assuming that Milledge was subject to a racially hostile work environment, there is no genuine fact issue to show that the City was aware of, yet negligent in failing to remedy, the misconduct of its employees. *See Bentley v. AutoZoners, LLC*, 935 F.3d 76, 91–92 (2d Cir. 2019).

The remaining incidents related to various coworkers and supervisors over the course of Milledge's employment lack any discernable connection to his race.[52] Although Milledge attempts to raise an inference of discrimination by showing that the City treated him differently than similarly situated white firefighters, he has not shown a genuine fact issue that he was "similarly situated in all material respects" to these comparators. *De Jesus-Hall v. New York Unified Ct. Sys.*, 856 F. App'x 328, 330 (2d Cir. 2021). Rather, as detailed below, Milledge fails to adduce evidence that he was treated differently than others who were similarly situated to him during each interaction:

- Milledge was denied promotions in 2006, 2009, and 2014, while lesser-qualified white firefighters were promoted. But Milledge has not offered any evidence as to who made these employment decisions and on what basis, nor has he shown that he was more qualified than the white firefighters who were promoted.

---

[51] The City argues that Milledge failed to exhaust administrative remedies with respect to the locker break-in and the racist anonymous calls because he did not include those claims in his CHRO complaint. But the locker break-in is reasonably related to Milledge's other complaints of harassment, such that it would be expected to fall within the scope of the agency's investigation of those claims. *See Mathirampuzha v. Potter*, 548 F.3d 70, 75 (2d Cir. 2008). And the allegation of racist anonymous calls does not "amount to a new claim; it is simply an additional factual allegation supporting plaintiff's underlying … hostile work environment claims." *DeBerry v. Brookdale Univ. Hosp. & Med. Ctr.*, 11 F. Supp. 3d 387, 396 (E.D.N.Y. 2014).

[52] The City argues that all of Milledge's claims regarding pre-October 2017 conduct are time-barred. Because I conclude that there is no evidence to substantiate a hostile work environment claim even considering conduct outside the limitations period, I need not decide whether Milledge has adequately alleged a continuing violation so as to delay commencement of the limitations period. *See Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001).

- When Milledge's mother died in 2008, the Human Resources director denied his request for FMLA leave. Although Milledge is unaware of white firefighters being denied leave under similar circumstances, he has not offered any evidence that a similarly situated white firefighter was in fact granted FMLA leave following the death of a parent.

- In 2012 or 2013, Milledge was forbidden from leaving the fire station to get food, while white firefighters were allowed to do so. But Milledge had been previously suspended after testing positive for drug use, and he has not offered any evidence that white firefighters who had previously tested positive for drugs at work were not subject to the same restrictions.

- In 2015, Chief Brady required Milledge to complete random drug-testing, but only after Milledge left the firehouse for an extended period of time in violation of his direct supervisor's order. Milledge does not know what drug testing was required of other firefighters and has not offered any evidence that white firefighters who disobeyed orders and left during work hours after previously testing positive for drugs were not subject to similar testing requirements.

- Chief Kerr made Milledge do ladder training in August 2017 that was especially difficult for him because of his previous injuries. But Milledge has not contested the City's evidence that such training was required of all firefighters, and consequently he has not shown that racial animus motivated Chief Kerr's decision to require him to complete such training.[53]

- In September 2017, Chief Kerr reprimanded Milledge for using the handicapped bathroom when he was not handicapped, and Chief Costello told Milledge he would be fired if he did not get off the phone at work. In neither case does Milledge offer evidence of similarly situated comparators facing more preferential treatment or any other grounds to conclude that his supervisors chastised him due to his race rather than his misbehavior at work.

- In March 2018, Milledge had abrasive encounters with Chief Tenney and Chief Errickson. But by Milledge's own account, these altercations stemmed not from racial animus but rather from his EEOC complaint against Chief Brady.[54] Milledge did not

---

[53] Nor has Milledge brought discrimination or failure to accommodate claims on the basis of any disability arising from his prior injuries.

[54] *See* Doc. #43-3 at 17, 40-41 (Milledge deposition):

> Q: Did Chief Tenney do anything to you?
>
> A: Chief Tenney and me never had a problem until Chief Brady's complaint. That's what I'm trying to say. Nobody had a problem with me all the time until Chief Brady's complaint. Once I complained about Chief Brady, all the leaders on the department started attacking me. …
>
> Q: So your issues with Chief Tenney are as a result of you filing your prior complaint about Chief Brady?
>
> A: Exactly. They told me that. …
>
> Q: At the last deposition you told me you didn't have any problems with Chief Erickson until you filed

9

bring a retaliation claim against the City for the acts of these supervisors purportedly in response to his report against Brady in 2015.

Even had Milledge shown evidence of racial animus on the part of these supervisors and coworkers, none of their conduct rises to the level of objectively severe and pervasive harassment as required to substantiate a hostile workplace environment claim. *See Littlejohn*, 795 F.3d at 320–21. "Isolated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe." *Zheng-Smith v. Nassau Health Care Corp.*, 2021 WL 4097316, at *3 (2d Cir. 2021). Accordingly, I will grant summary judgment for the City as to Milledge's claim of a racial hostile working environment.

### *ADEA hostile workplace environment*

The ADEA makes it unlawful for an employer to discriminate against an individual over the age of 40 "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §§ 623(a)(1), 631(a). The same standards apply to hostile work environment claims brought under the ADEA as apply to claims brought under Title VII. *See Terry v. Ashcroft*, 336 F.3d 126, 147–48 (2d Cir. 2003). Namely, a plaintiff must show that conduct based on his age was objectively hostile and that he subjectively perceived the environment to be abusive. *See Davis-Garett v. Urb. Outfitters, Inc.*, 921 F.3d 30, 41 (2d Cir. 2019). That standard is met "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ibid*.

Milledge has not raised a triable fact issue as to his ADEA hostile workplace environment claim because he has not offered any evidence that the City subjected him to

---

your complaint against Chief Brady; is that correct?
A: That's correct.

adverse treatment because of his age. The only age-related incident in the record is Captain Thompson's encouragement for Milledge to retire in late 2017. Yet Milledge himself attributed these comments not to age discrimination but to retaliation for his EEOC complaint against Brady.[55] There is therefore no basis in the record for a finding of age discrimination. Moreover, Thompson's conduct did not approach the level of objective severity and pervasiveness required to substantiate a hostile workplace environment claim. *See Zako v. Encompass Digital Media, Inc.*, 2020 WL 3542323 (D. Conn. 2020) (single age-related comment about younger workers being willing to do overnight shifts did not constitute severe and pervasive harassment).

## CONCLUSION

For the reasons set forth above, the Court GRANTS the City of Hartford's motion for summary judgment (Doc. #43). The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 16th day of August 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

---

[55] Doc. #43-2 at 8 (¶ 55).